

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-25-2004

# USA v. Irvin

Precedential or Non-Precedential: Precedential

Docket No. 03-1862

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"USA v. Irvin" (2004). *2004 Decisions.* Paper 644.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/644

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

IN THE UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT
_____

No. 03-1862
_____

UNITED STATES OF AMERICA


v.

KYLE IRVIN,

*Appellant*

_____

On Appeal from the United States
District Court
for the Eastern District of Pennsylvania
Criminal No. 99-cr-00566
District Judge: Honorable Stewart
Dalzell

_____

Argued March 26, 2004

Before: AMBRO, CHERTOFF and
BECKER, *Circuit Judges*

(Filed  May 25, 2004   )

MAUREEN KEARNEY ROWLEY
Chief Federal Defender
DAVID L. MCCOLGIN
Assistant Federal Defender
Supervising Appellate Attorney
DINA CHAVAR (Argued)
Research & Writing Specialist
Federal Court Division
Defender Association of Philadelphia
Suite 540 West - Curtis Center
Independence Square West
Philadelphia, PA 19106

*Attorneys for Appellant*

PATRICK L. MEEHAN
United States Attorney
LAURIE MAGID
Deputy United States Attorney
  For Policy and Appeals
ROBER A. ZAUZMER
Assistant United States Attorney
Senior Appellate Counsel
FRANK R. COSTELLO, JR. (Argued)
Assistant United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106

*Attorneys for Appellee*

_____

OPINION OF THE COURT
_____


BECKER, *Circuit Judge*.


This is an appeal by Kyle Irvin from a judgment in a criminal case entered pursuant to a plea of guilty to two counts of being a previously convicted felon in possession of a firearm in violation of 18 U.S.C. § 922(g).  Irvin was sentenced to seventy-two months in prison. The appeal, which presents three sentencing issues, arises out of the tragic accidental shooting

of Irvin's three-year-old son, Daequan, on June 9, 1998, at the home of Irvin's mother, Dollie Irvin, where Irvin and Daequan were living. While playing, Daequan found a .40 caliber Smith & Wesson pistol that Irvin kept in their room, and accidentally shot himself with it. Daequan died four days later in the hospital. Police recovered the gun that Daequan accidentally fired after Irvin told them where it could be found.

Irvin was prosecuted by the Commonwealth of Pennsylvania for endangering the welfare of children and involuntary manslaughter, and by the federal government on the felon-in-possession charge. He entered guilty pleas in both cases. The issues on appeal pertain to sentencing determinations made by the District Court regarding the number of weapons Irvin had in his possession (which bears on his Sentencing Guidelines range); whether he accepted responsibility; and whether inclusion of the state offenses in his criminal history calculation was plain error. We reject Irvin's first two assignments of error, but conclude that the District Court plainly erred in including the state offenses in the criminal history calculation. We will therefore vacate the judgment of the District Court and remand for resentencing.[1]

[1]The judgment of the District Court was originally entered on June 12, 2000, but on March 19, 2003, the District Court denied Irvin's motion under 28 U.S.C. § 2255 for resentencing. Irvin's notice of appeal on March 26, 2003, was therefore

## I.

The District Court enhanced Irvin's offense level under U.S.S.G. § 2K2.1(b)(1)(B) for possessing eight firearms, and, because Irvin denied possession of those firearms, refused to grant a reduction under U.S.S.G. § 3E1.1 for acceptance of responsibility. Irvin contends that this was error in view of the lack of direct proof that he exercised dominion and control over all of the firearms. In our view, however, neither the District Court's finding that Irvin constructively possessed the other six guns charged in count II, nor its finding that Irvin was not entitled to an adjustment for acceptance of responsibility, was clearly erroneous.[2]

## A.

On the day of the shooting Irvin advised the first officer on the scene that his son found his gun and accidentally fired it, that he did not have a license for the gun, and that he had thrown the gun out the back bedroom window. He was

timely, and we have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

[2]We exercise plenary review over a district court's legal interpretation of the Sentencing Guidelines, but our review of the factual findings supporting a district court's application of the Guidelines is only for clear error. *See United States v. Fenton*, 309 F.3d 825, 827 n.2 (3d Cir. 2002) (citing *United States v. Butch*, 256 F.3d 171 (3d Cir. 2001)).

arrested and taken into custody. Later that same day at the station house, Irvin told officers that, in fact, the gun could be found in the back bedroom underneath the mattress with some other guns. When a search of Mrs. Irvin's home was conducted pursuant to a warrant, six guns were recovered from her house in addition to the .40 caliber Smith & Wesson pistol. Just as he had told the police, Irvin's pistol was found in the upstairs back bedroom underneath the mattress. Two other guns were also under the mattress, and two more were under the bed. A sixth gun was found in the closet of that same bedroom. A seventh gun was found in the living room of the home.

There was in fact no direct evidence (e.g., fingerprints, purchase receipts) that Irvin had dominion and control over the other guns—five of which were found in the back bedroom, which was where Irvin's cousin Lucius Joe resided, and one of which was found in the common area living room. Irvin testified that he kept the gun his son used in the middle bedroom where they slept; that after the tragedy he "instinctively" hid the gun used by his son under the mattress in the back bedroom; that he did not know the other two guns were under the mattress until he saw them while hiding the gun; that he was unaware of the presence of any of the other four weapons found in the house (one of which was found in the open in the living room); that Lucius Joe had previously showed him three of the guns that were found in the back bedroom on June 9, 1998; and that the six other guns found on June 9, 1998

were not his.

The District Court discredited Irvin's testimony concerning his knowledge, possession, and ownership of the other six firearms and set forth the reasons for its findings. The Court concentrated on (1) Irvin's initial lie to the police (he told them that he had thrown the gun out the window); (2) the fact that rather than get medical help for his son, Irvin first hid the gun and spent shell, because he knew he could not legally have possession of a gun; and (3) its conclusion that Irvin's testimony that it was his "instinct" to put the gun in the back bedroom and that "I don't know why I had a gun" was unworthy of belief. The Court ultimately determined that Irvin possessed a total of eight firearms.[3] It then concluded that Irvin was not entitled to a reduction in his offense level for acceptance of responsibility because he had offered false testimony, stating that "a defendant who has . . . presented absolutely fantastic testimony . . . is not one who has shown acceptance of responsibility."

B.

The government had the burden to prove, by a preponderance of the evidence,

---

[3]The foregoing catalog only lists seven firearms. The eighth was recovered by police following a separate incident almost a year before in a consent search of Irvin's residence at the time. This incident was charged in a separate count of the indictment.

3

*see United States v. Evans*, 155 F.3d 245, 253 (3d Cir. 1998), that Irvin knew of the guns' presence and had control or the power and intention to exercise control over them, *see United States v. Iafelice*, 978 F.2d 92, 96 (3d Cir. 1992). Some of our cases involving possession of controlled substances have held that mere evidence of presence in a house where drugs were found, proximity to the drugs (and knowledge that they were there), and association with other residents are not enough to establish dominion and control. *See United States v. Jenkins*, 90 F.3d 814 (3d Cir. 1996); *United States v. Brown*, 3 F.3d 673 (3d Cir. 1993).

In this case, however, there was more: Irvin hid the gun his son had used right next to two other handguns, in the same room that a shotgun and two other rifles were discovered. Further, he initially lied to the police about the location of the gun his son had used, saying that he had thrown it out the window. Additionally, Irvin had a prior firearms possession, as reflected by the predicate conviction for the felon-in-possession charge—a 1995 state conviction for carrying a firearm in a public place and carrying firearms without a license. *See United States v. Jernigan*, 341 F.3d 1273, 1281-82 (11th Cir. 2003) (prior convictions involving knowledge of presence of gun); *United States v. Cassell*, 292 F.3d 788, 793 (D.C. Cir. 2002); *United States v. Moorehead*, 57 F.3d 875, 878 (9th Cir. 1995). With respect to the gun found in the living room, it was out in the open, and found in the very box that the gun Irvin admittedly possessed had

originally been purchased in. While the question is quite close, at least with respect to the gun found in the closet in Lucius Joe's bedroom, which there is no evidence Irvin ever saw, we think that this evidence was sufficient so that the District Court's findings were not clearly erroneous.[4]

We also find no merit in Irvin's contention that the District Court improperly shifted the burden of proof by requiring him to disprove that he possessed the six firearms at issue and failed to make the "required findings" concerning the issue of possession. This simply did not happen. We defer to the District Court's discrediting of Irvin's denial of possession of the disputed six guns, and its concomitant denial of the adjustment for acceptance of responsibility. *See United States v. Cianscewski*, 894 F.2d 74, 83 (3d Cir. 1990) (determination that defendant did not accept responsibility will be reversed only if "clearly erroneous"). At all events, we agree that when a defendant denies relevant conduct that the district court subsequently determines to be true, a district court may properly deny a downward adjustment for acceptance of responsibility. *See* U.S.S.G. § 3E1.1 Application Note 1(a).

---

[4]Reversing the District Court's finding regarding Irvin's possession on any one of the six disputed guns would not be harmless because U.S.S.G. § 2K2.1(b)(1)(B), under which Irvin's sentence was enhanced, requires a minimum of eight firearms.

4

## II.

We turn to the last issue on appeal—whether Irvin's criminal history score erroneously included one point for the sentence he received for the involuntary manslaughter conviction in state court. Irvin contends that that offense conduct was part of the same course of conduct as the instant offense, and therefore should not have counted as a prior sentence pursuant to U.S.S.G. § 4A1.2(a)(1). We agree.

## A.

Shortly after Daequan's death, the Commonwealth of Pennsylvania charged Irvin with endangering the welfare of children, involuntary manslaughter, and related offenses. It is not disputed that the conduct that was the subject of these charges was Irvin's leaving the pistol in a place where his three-year-old son could easily reach the firearm. On November 10, 1998, Irvin pleaded guilty to the endangering and manslaughter charges before Court of Common Pleas Judge Carolyn Temin. During the guilty plea colloquy, Judge Temin advised Irvin that in order for the Commonwealth to prove involuntary manslaughter, it would have to prove that Irvin "did something . . . in a highly negligent manner, and in this case that would involve leaving a gun that could be fired in a place where a small child could pick it up and fire it." On December 22, 1998, Judge Temin sentenced Irvin to seven years' probation on the involuntary manslaughter charge and suspended sentence on the endangering charge.

On September 14, 1999, Irvin was indicted in the District Court on two counts of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Count II of the indictment charged Irvin with possession of the .40 caliber Smith & Wesson pistol that Daequan accidentally fired on June 9, 1998.[5] This gun was recovered by Philadelphia police that same day and formed the basis for the state involuntary manslaughter charge. Irvin entered into a plea agreement which provided that he would plead guilty to both counts. However, on the second count, which listed the seven guns recovered from his mother's home, Irvin agreed only to possessing the gun listed first in that count—the .40 caliber Smith & Wesson pistol that he told police on June 9, 1998, belonged to him. The plea agreement also included stipulations that Irvin would receive a two point reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a), and an additional one point reduction for timely notifying the government of his intention to plead guilty under U.S.S.G. § 3E1.1(b).

At sentencing, the District Court adopted the criminal history calculation in the presentence report, which added one point to Irvin's criminal history score under U.S.S.G. § 4A1.1(c) for the state

---

[5]Count I of the indictment was the earlier and unrelated possession offense alluded to *supra* note 3.

5

sentence that Irvin had received on the involuntary manslaughter charge resulting from the accidental shooting that occurred on June 9, 1998. The Court did so even though U.S.S.G. § 4A1.2(a)(1), and Application Note 1 thereto, direct that only prior sentences involving conduct that was not part of the instant offense are counted for criminal history purposes. Irvin argues that the state manslaughter conviction should not have been included in his criminal history calculation because it was predicated on conduct that was part of the instant offense. Without the inclusion of the one point he received for the state manslaughter conviction, Irvin would have been placed in criminal history category I. Instead, Irvin was sentenced within the guideline range for a criminal history category II offender. Correcting this error reduces Irvin's guidelines range from sixty-three to seventy-eight months to fifty-seven to seventy-one months.

B.

The key section before us is U.S.S.G. § 4A1.2. Subsection (a) defines "prior sentences" for the purposes of determining which sentences should be included in a defendant's criminal history score: "The term 'prior sentence' means any sentence previously imposed upon adjudication of guilt . . . for conduct not part of the instant offense." Application Note 1 to § 4A1.2 elaborates that "[a] sentence imposed after the defendant's commencement of the instant offense, but prior to sentencing on the instant offense, is a prior sentence if it was for conduct other than conduct that was part of the instant offense." Such was the case here: The conduct constituting the instant offense (i.e., the felon-in-possession conviction) occurred, per the indictment, on June 9, 1998; sentencing for the instant offense occurred on June 13, 2000; but sentencing on the state manslaughter conviction occurred prior thereto, on December 22, 1998.

Application Note 1 further explains that "[c]onduct that is part of the instant offense means conduct that is relevant conduct to the instant offense under the provisions of § 1B1.3 (Relevant Conduct)." Thus, if the conduct leading to the manslaughter conviction would be relevant conduct under § 1B1.3, then the manslaughter conviction cannot be counted towards Irvin's criminal history score. The government conceded this in its papers filed in connection with Irvin's 28 U.S.C. § 2255 hearing, *see supra* note 1, stating that "the death of defendant's son could have been included as relevant conduct, *see* Sections 2K2.1(c)(1)(B) and 2A1.4(a)(1) of the Guidelines, [but] it would not have increased the defendant's offense level." App. 147a.

As we see it, the essence of both offenses was Irvin's criminal possession of the .40 caliber Smith & Wesson pistol. He was convicted of the involuntary manslaughter of his son as a result of his criminally negligent conduct in leaving within reach of his son the pistol which his son accidentally fired. The present offense involves the federal prosecution for Irvin's illegal possession of that same gun. We do not see how one can separate the prior

6

state offense from the instant offense.

There is no perfectly analogous case. The most apposite is our decision in *United States v. Hallman*, 23 F.3d 821 (3d Cir. 1994). The defendant there was arrested for passing a stolen check at a hotel. A search of his car uncovered checks and credit cards stolen from the mail. *Id*. at 823. It was apparent that the stolen check passed at the hotel had been stolen from the mail. *Id*. at 826. The defendant pled guilty to the state forgery charge based on passing the stolen check, and was sentenced. He later pled guilty to a federal indictment charging possession of stolen mail. At the sentencing on the federal charge, the state sentence on the forgery charge was included in defendant's criminal history score as a prior sentence. We reversed and remanded for resentencing, holding that the forgery was "related" to the mail fraud in that it was part of the same plan or scheme—thus making it "relevant conduct," and excluding it from the criminal history computation.[6]

In reaching our decision, we noted that the conduct underlying the two offenses was connected in that the defendant "could not have forged a check until he had stolen the checks." *Id.* Just as Hallman could not have forged the check until he had stolen it, Irvin could not have exercised criminally negligent control over his Smith & Wesson pistol on June 9, 1998 unless he was in possession of it on the same date. Following *Hallman*, the conduct underlying Irvin's manslaughter conviction was relevant conduct for the instant offense, and thus the manslaughter conviction should not have been included in his criminal history.

The government urges, however, that we approach the case by determining whether the conduct of the present offense is "severable" from that of the prior offense, in which case the prior offense may be considered in the criminal history calculation. It cites *United States v. Banashefski*, 928 F.2d 349, 352-53 (10th Cir. 1991), which concluded that it was

---

[6]We put "related" in quotation marks to distinguish its usage here from its usage as a term of art in the Guidelines' similar, but distinct, concept of a "related case." Under U.S.S.G. § 4A1.2(a)(2) two (or more) related cases are counted as only one prior offense for purposes of computing an offender's criminal history score. Unless the offenses were separated by an intervening arrest, "prior sentences are considered related if they resulted from offenses that (A) occurred

on the same occasion, (B) were part of a single common scheme or plan, or (C) were consolidated for trial or sentencing." *Id.* Application Note 3. In *Hallman*, the Court explicitly stated that there was no Application Note 3 "related cases" argument to be made because the defendant had only one prior sentence. 23 F.3d at 825. Here, it is undisputed that Irvin's manslaughter conviction and his endangering conviction were related cases; the issue we address is their relationship to Irvin's federal conviction.

7

proper to include a state conviction for possession of a stolen car in the criminal history score for sentencing on a felon-in-possession offense, even though the firearm in question was found in the car at time of the defendant's arrest for driving the stolen car. The government asserts that factors that should be considered in this analysis include temporal and geographical proximity, the identity of the victims, and the applicable societal harms. It also relies on another Tenth Circuit case, *United States v. Browning*, 252 F.3d 1153, 1159 (10th Cir. 2001), where the Court applied this test and held that because the defendant unlawfully possessed a firearm before, as well as during and in conjunction with, the commission of a state drug trafficking offense, the state offense was not part of the firearm offense, and thus was properly considered as a prior conviction.

We find these cases both distinguishable on their facts and at odds with our jurisprudence. The Court of Appeals in both *Banashefski* and *Browning* made clear that, as a factual matter, there was evidence that the defendant possessed the firearm in question at a time *before* commission of the offense that the government sought to include in the defendant's criminal history score. *See Browning*, 252 F.3d at 1159 ("[Browning] admitted to getting the gun in Arizona before he [engaged in illegal drug activity]."); *Banashefski*, 928 F.2d at 352 (explaining that Banashefski's felon-in-possession offense "was complete *before* he approached the car [that he stole]"). In

contrast, in count II the government did not indict Irvin for, nor did it at any time adduce evidence of, Irvin's possession of a firearm at any time other than June 9, 1998. Moreover, as a legal matter, we have not adopted the severability test; indeed in *Hallman* we *declined* to adopt it.

The government also relies on *United States v. Oser*, 107 F.3d 1080 (3d Cir. 1997), for the proposition that where a defendant's prior offense played no part in the determination of his sentence on the instant offense, the conduct for which he was previously sentenced was not "relevant conduct" for guidelines purposes, and that the prior sentence therefore need not be excluded from the calculation of his criminal history category. The defendant in *Oser* was convicted of a drug conspiracy and money laundering, and argued that his prior conviction for underreporting of currency should not have been included in his criminal history computation because the conduct underlying the underreporting-of-currency conviction was relevant conduct to the drug conspiracy and money laundering.

Irvin argues that *Oser* is distinguishable. In Irvin's submission, the reasoning of *Oser* depended on the factual determination that no connection was shown between the underreporting of currency and the drug conspiracy / money laundering offense. Because this connection was absent, the conduct underlying the underreporting-of-currency offense was not relevant conduct to Oser's instant offense, and so the sentence for

8

underreporting of currency could be counted as a prior sentence for purposes of calculating Oser's criminal history score. In contrast, Irvin points out, his criminally negligent control of the Smith & Wesson "occurred during the commission" of his illegal possession of that firearm, U.S.S.G. § 1B1.3(a)(1), and hence the state sentence on the involuntary manslaughter charge was relevant conduct. We agree; the offense committed by Irvin, as charged in both the state and federal indictments, centered on the passive act of possessing a firearm on June 9, 1998.

Moreover, the government's characterization of *Oser* misreads that case and Application Note 1 to U.S.S.G. § 4A1.2. The test is not whether a separate offense "played [a] part" in determining the offense level (presumably in the sense of arithmetically altering the offense level), but rather whether the underlying conduct was "relevant conduct." Even though not all relevant conduct affects the ultimate offense level, Application Note 1 excludes from the criminal history computation sentences based on relevant conduct. In essence, the government argues that it should be able to elect to treat, at its option, certain activity either as relevant conduct, or as a prior offense. This "heads I win, tails you lose" gambit simply has no basis in the regime of the Sentencing Guidelines.

The government's final argument is that the federal crime differs from the state crime because Irvin possessed the weapon before June 9, 1998, but after his 1995 predicate felony conviction. But as we have already noted in distinguishing *Banashefski* and *Browning*, the federal indictment does not so allege, nor was any proof offered to that effect, so that argument fails.

## C.

In sum, Irvin's sentence on the state manslaughter conviction should not have been included in his criminal history computation. But for this error, Irvin would have been sentenced as a criminal history category I offender, with a correspondingly lower guideline range. As noted above, we review for plain error. To establish plain error, a defendant must prove that there is "(1) 'error,' (2) that is 'plain,' and (3) that 'affects substantial rights.' If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *Johnson v. United States*, 520 U.S. 461, 467 (1997) (citations omitted). With respect to this final step, we have held that we will generally exercise our discretion to recognize a plain error in the (mis)application of the Sentencing Guidelines. *See United States v. Knight*, 266 F.3d 203, 206 n.7 (3d Cir. 2001) ("[A] sentence resulting from a plainly erroneous misapplication of the Guidelines gives rise to at least a presumptively appropriate occasion for exercise of our discretionary power to correct the error.").

As we have shown, there was error here. It was also plain. We have

9

explained that this prong of the test "is met if the error is 'obvious' or 'clear under current law.'" *United States v. Vazquez*, 271 F.3d 93, 100 (3d Cir. 2001) (en banc) (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)). Coupled with the relative clarity of the Sentencing Guidelines, our decision in *Hallman* is sufficiently on-point to satisfy the requirement that error be "plain." Finally, the error affected Irvin's substantial rights: Without the addition of the criminal history point for the manslaughter conviction, Irvin now falls in the guideline range for category I, offense level 25, which is fifty-seven to seventy-one months. Irvin received a seventy-two month sentence, and so was prejudiced by the Court's error as his sentence exceeded the guideline range which should have been applied. *See United States v. Knobloch*, 131 F.3d 366, 373 (3d Cir. 1997) (plain error affected defendant's "substantial right to suffer no greater an imposition on his liberty than the Guidelines allow" when error resulted in higher sentencing range).

Accordingly, the judgment of sentence will be vacated and the case remanded for resentencing.